UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. 11 CR 797 |
| OMAR ALEJANDRO QUINONES-ORTIZ, ) | |
| ) | Judge John W. Darrah |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Omar Alejandro Quinones-Ortiz's Motion to Suppress certain evidence, including physical evidence recovered from his residence and his post-arrest statement. The Government filed a response in opposition to Defendant's motion. An evidentiary hearing was held to determine the admissibility of the evidence. The parties submitted post-hearing briefs. After consideration of the facts presented at the hearing and the arguments and authority presented by the parties, Defendant's Motion to Suppress [16] is denied.

## BACKGROUND

The following facts are based upon the testimony of the witnesses examined at the suppression hearing and other evidence submitted by the parties. *See United States v. Melendez*, No. 11-CR-356, 2012 WL 3598731, at *1 (N.D. Ill. Aug. 20, 2012).

*The Investigation*

In February 2011, the Drug Enforcement Administration ("DEA") began investigating Jorge Villa, a purported drug trafficker in Chicago.[1] In the course of the Government's investigation of Villa's drug trafficking organization ("DTO"), 13 kilograms of heroin were seized, along with $310,900.00 in narcotics proceeds. The DEA legally intercepted Villa's phone communications from February 2011 through November 2011. Most of Villa's intercepted phone calls were conducted in Spanish and translated to English.

On June 26, 2011, Defendant called Villa, and Defendant identified himself by his full name. This phone call was intercepted by the DEA. Defendant asked Villa to send him some money and also discussed another individual, explaining that the other individual "snorts too much powder, man. . . ." (Gov't's Resp. to Mot. to Suppress at 3.) The Government refers to other examples of phone calls between Villa and Defendant that were intercepted. On June 27, 2011, Villa called Defendant and apparently discussed the proper order of Defendant's names. (*Id.* at 4.) Defendant acknowledged that the

---

[1] On November 4, 2011, Jorge Villa was arrested and charged in the Northern District of Illinois with conspiracy to possess with the intent to distribute over 1,000 grams of heroin and over 100 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 846. *See* Case No. 11-CR-795. On November 30, 2011, Villa was indicted and charged with conspiracy to possess with intent to distribute over 1,000 grams of heroin, distribution of more than 1,000 grams of heroin, and uses of his cellular phone to facilitate the heroin conspiracy, in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846. *See* Case No. 11-CR-842. On July 9, 2012, Villa entered a plea of guilty as to the first charge in 11-CR-842. *Id.* Villa was also indicted on November 30, 2011, with co-defendant Armando Vega-Medina, and charged with conspiracy to possess with intent to distribute more than 100 kilograms of marijuana; possession with intent to distribute more than 100 kilograms of marijuana; and the use of a cellular phone to facilitate the marijuana conspiracy, in violation of 21 U.S.C. §§ 841(a)(1), 843, and 846. *See* Case No. 11-CR-843.

proper order of his last names is Quinones-Ortiz. (*Id.*) Defendant also said, "Okay, we're still waiting, okay?" The Government characterized this statement to mean that Defendant "told Villa that they were still waiting on a pending narcotics load." (*Id.*) Then, on September 11, 2011, Villa called Defendant again, and the Government stated that the following conversation transpired:

> Villa: Hey, my buddy wants you to go get the phone at Honorio's. He left it there. Do you think you'll be able to make it there?
>
> Defendant: Uh . . . I think so.
>
> Villa: If you want, go ahead and do him the favor.
>
> Defendant: I'll go right now.
>
> Villa: All right, then.
>
> Defendant: Hey, and what about the girl?[2] Because he wants it now, because he can do it during the weekday.
>
> Villa: The girl is fine for the evening. In the evening, (unintelligible) . . . people there.
>
> Defendant: Sounds good.

(*Id.* at 5.) The Government further refers to another conversation intercepted between Villa and Defendant, which the Government interpreted as a discussion of narcotics proceeds.

> Defendant: There are 8 pesos left. Remember that I grabbed a 10 and brought it to the old man?
>
> Villa: That's right. What have you sent to my uncle yesterday?
>
> Defendant: I sent him 5 pesos.

---

[2] The Government interprets "the girl" to be heroin in its Response to Defendant's Motion.

3

> Villa: Okay, that's good, and before that you sent 2, right?
>
> Defendant: I had sent him 3 and 1. Well, it was 2 and 1 to the guy and the 5 that I sent him yesterday.
>
> Villa: So how much have you sent to my uncle? 9?
>
> Defendant: I sent him 5 and another time I sent him 1, 2 . . . it's about 9 that I have sent him.
>
> Villa: Look, it can't be more or less. It has to be exact so we won't mess up there. Whatever you send to whomever, please write it down.
>
> Defendant: Okay, but there are 8 left there.
>
> Villa: Okay, that number that I gave you, send 5 so it doesn't look bad.
>
> Defendant: Okay, what else?
>
> . . .
>
> Villa: Are you going to go right now?
>
> Defendant: I'll go later on, or is it urgent?
>
> Villa: No, it's not, so you can do 2 trips at one time.

(*Id.* at 5-6.) Based on these intercepted conversations, and others heard by the DEA during the investigation of the conspiracy, the DEA determined Villa and Defendant were discussing drug trafficking, arranging for Defendant to obtain heroin for a customer, and detailing the distribution of drug-trafficking proceeds. (*Id.* at 3-6.)

The DEA also conducted surveillance in Chicago, on October 13, 2011, anticipating that Defendant would be meeting with Villa and another individual, "Poncho." The surveillance showed Defendant, Poncho, and Villa exiting a restaurant in Chicago. Later that same day, surveillance showed Defendant and Poncho visiting a mobile phone store together but no criminal conduct on the part of either individual. (*Id.* at 6-7.)

4

*The Arrest, Search, and Confession*

On November 7, 2011, the Government arrested the individuals associated with Jorge Villa and his DTO. (Hr'g Tr. 13:7 – 13:24.) The Government planned this "take-down" in advance of November 7, 2011, but did not obtain an arrest or search warrant for Defendant or his residence, although the location of Defendant's residence was known to the Government based on previous surveillance. (*Id.* at 33:8 – 34:12, 15:9 – 15:11.) Instead, the Government planned to inform Defendant (as well as other Villa associates) that Villa had been arrested and to let Defendant know the Government was aware of other individuals' involvement in Villa's DTO.

DEA Special Agent Keyur Patel and Task Force Officer Rudolfo Avalos testified about Defendant's arrest. On November 7, 2011, the DEA established surveillance near 2728 North Marmora Avenue in Chicago, Illinois, near the residence of Defendant, at 2730 North Marmora Avenue. Special Agent Patel saw Defendant walking down Marmora Avenue. (*Id.* at 15:18 – 15:23.) Special Agent Patel, Task Force Officer Avalos, and Special Agent Luke McConnell, dressed as police officers, approached Defendant and handcuffed Defendant to search him for weapons. (*Id.* at 17:10 – 18:17; 80:4 – 81:1.) The agents performed the pat-down because, in their experience as DEA agents, members of DTOs are often armed. (*Id.*) The DEA agents described this search as a brief pat-down, and after determining Defendant was unarmed and unlikely to flee, he was unhandcuffed. (*Id.*) Task Force Officer Rodolfo Avalos spoke to Defendant in Spanish, asking him if he was Omar Quinones-Ortiz, and if he had identification. (*Id.* at 56:8 – 56:16.) Avalos informed Defendant the agents were there as part of an ongoing

narcotics investigation and asked Defendant if he had any narcotics, drug proceeds, or weapons in his residence; Defendant replied that he did not. (*Id.* at 57:3 – 57:12.)

Thereafter, Task Force Officer Avalos asked Defendant, in Spanish, if he would give his consent to search his residence. (*Id.* at 57:15 – 58:1.) Defendant was cooperative, not agitated, and agreed to the search. Defendant told the officers his keys to the residence were in the pocket of his coat, which was at the grocery store where he worked. (*Id.* at 58:2 – 58:9; 60:23 – 61:7.) Task Force Officer Avalos testified that Defendant was not permitted to go into the store and get his keys by himself. (*Id.* at 83:24 – 84:4.) Rather, the agents went into the store while Defendant remained in the back of Task Force Agent Stahl's sports utility vehicle. (*Id.* at 58:10 – 58:25.) Avalos entered the grocery store and obtained Defendant's jacket and the keys. (*Id.* at 59:3 – 59:21.) Then, the agents drove with Defendant back to his residence, a few blocks away, where they exited the agent's vehicle and approached the front door of Defendant's residence, 2730 North Marmora. (*Id.* at 59:22 – 60:4.)

When they arrived at the front door of Defendant's residence at approximately 11:00 a.m., Defendant stopped the agents and informed them that they needed to go around to the back of the building to enter his residence. (*Id.* at 60:11 – 61:19.) The agents handed Defendant's keys to him, and he unlocked the door of his residence for the agents. (*Id.* at 61:12 – 61:19.) The agents entered Defendant's residence and conducted a protective sweep to confirm the residence was empty; while this brief sweep was performed, Defendant and Task Force Officer Avalos waited in the stairwell outside the entrance. (*Id.* at 61:20 – 62:4.) Then, Defendant and Avalos entered the residence and

6

went to the dining room area; the residence contained no furniture other than a mattress in the bedroom and a folding table without chairs. (*Id.* at 62:5 – 62:18.)

Once Defendant and Avalos entered the residence, an agent produced a "Consent to Search Form" written in Spanish. (*Id.* at 62:16 – 63:3.) Avalos read the Consent to Search Form to Defendant, in Spanish, and wrote down Defendant's address, also including on the form that the search would include the garage and Defendant's Toyota Avalon. (*Id.* at 63:6 – 63:18.) After Avalos read the form to Defendant in Spanish, Avalos asked Defendant if he could read; Defendant advised that he could read and appeared to read the form upon receiving it from Avalos. (*Id.* at 63:19 – 63:23.) After reading the Consent to Search Form, Defendant signed the form. (Motion to Suppress, Ex. B.) This occurred at 11:33 a.m. (*Id.*) Then, Avalos and Task Force Officer Mark Porlier also signed the form. (Hr'g Tr. 63:19 – 64:25.) Avalos testified that he filled out the form with the address and other property to be searched prior to reading the form to Defendant. (*Id.* at 66:6 – 66:12.)

The agents began to search the residence as Defendant and Avalos remained in the dining room area, with Defendant seated on the floor of the dining room. (*Id.* at 64:25 – 65:12.) After about ten minutes of searching, one of the agents discovered a small bag that appeared to contain cocaine, which was shown to Defendant and Avalos. (*Id.* at 66:25 – 67:2; 86:12 – 87:7.) Avalos then read Defendant his *Miranda* rights in Spanish, from a preprinted card with the *Miranda* warning printed in both Spanish and English. (*Id.* at 67:4 – 67:25, 87:11 – 87:14.) Then, Avalos read an "Advice of Rights Form" in Spanish to Defendant. (*Id.* at 69:11 – 69:13; Government's Exhibit Consent.)

Defendant was given the form and was asked to initial next to each of the rights listed on the form and sign the form; he complied. (*Id.* at 71:9 – 71:18; Government's Exhibit Consent.) Avalos, to be certain Defendant understood what initials are, told Defendant that an initial was the first letter of his first name and the first letter of his last name, and Defendant wrote "OO" next to each right listed on the Advice of Rights Form. (*Id.* at 88:11 – 89:15.)

After advising Defendant of his *Miranda* rights, Avalos questioned Defendant about the bag found, and Defendant stated that he had found it or received it at a party. (*Id.* at 87:9 – 87:24.) In the course of searching Defendant's garage and his Toyota, the agents discovered items they believed to be used to package narcotics and narcotics proceeds, including a large garbage bag filled with a heat sealer, heat sealing bags, duct tape, and several rubber bands. (*Id.* at 24:2 – 24:24.) In the trunk of Defendant's unlocked Toyota, the agents also discovered a black bag which contained a kilogram of cocaine. (*Id.* at 26:3 – 27:1.) Defendant told agents he worked in Villa's DTO as a runner and that the brick of cocaine found in his trunk was given to him by Poncho, Villa's brother-in-law. (Gov't's Resp. at 11.)

## LEGAL STANDARD

Resolving a motion to suppress evidence requires a district court to consider all evidence presented and make factual determinations. "As the resolution of a motion to suppress is a fact-intensive inquiry, the district court's credibility determinations are reviewed deferentially, given its opportunity at the suppression hearing to hear the

8

testimony and observe the demeanor of the witnesses." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005).

When a defendant moves to suppress evidence, he bears the burden of making a *prima facie* showing of illegality. *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992). "The burden is on the movant to make specific factual allegations of illegality, to produce evidence, and to persuade the court that the evidence should be suppressed." *United States v. Evans*, 572 F.2d 455, 486 (5th Cir. 1978) *cert.* denied, 439 U.S. 870 (1978).

## ANALYSIS

Defendant moves to suppress the evidence discovered on November 7, 2011. Defendant argues he did not knowingly and voluntarily consent to a search of his home, garage, and car and that the fruits of this search should be barred. Defendant further argues that he was not properly advised of his *Miranda* rights and that, therefore, his post-arrest statement should be suppressed.

Neither Defendant nor anyone else on his behalf testified, nor did Defendant present any other evidence at the suppression hearing. In support of his Motion to Suppress, Defendant submits a signed, but unsworn, statement, detailing his account of the material events of November 7, 2011. In the statement, Defendant states he was handcuffed, had his apartment searched without his permission, and was forced to sign two separate forms (the Consent to Search Form and the Advice of Rights Form) without knowing what the forms said. (Mot. Ex. A.)

9

## *The Investigative Stop*

Defendant first argues that when he first encountered the agents, he was forcibly detained and "in custody," though the agents did not have a warrant for his arrest and that his detention constituted an illegal arrest. The Government counters that when agents handcuffed Defendant to pat him down, it was a lawful, investigative stop.

A police officer is permitted, in the interest of his own safety, to stop and frisk a suspect with less than probable cause if he has a reasonable suspicion the defendant is armed. *United States v. Robinson*, 537 F.3d 798, 801 (7th Cir. 2008) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Here, the agents had reasonable suspicion to believe Defendant was armed. When they stopped Defendant, they were aware that Defendant was part of Jorge Villa's DTO. As set out above, the agents testified that, based on their training and experience, they know drug-traffickers often carry weapons. Considering the information they received during the investigation, especially the intercepted telephone conversations between Villa and his associates, including Defendant, the agents had reasonable suspicion to believe Defendant might be armed when they briefly detained him.

Moreover, "[f]or an investigative stop based on reasonable suspicion to pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011) (quoting *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994)). Here, the agents' detention of Defendant was so brief in

duration and minor in scope that the restraint of Defendant was reasonable. He was handcuffed only long enough to be patted down for weapons and then released from the restraints once it was determined that Defendant was unarmed and unlikely to flee. Therefore, the agents' brief detention of Defendant was reasonable and did not violate his constitutional rights.

*Consent to Search*

After the lawful pat-down of Defendant, the agents asked to search his residence, and Defendant agreed. Defendant contends he remained in custody thereafter and was driven to his place of work so the agents could obtain his keys, and then transported back to his residence. (Mot. to Suppress at 1.) Further, Defendant argues the fact that the agents would not permit Defendant to enter the store where he worked without being escorted by an agent further demonstrates Defendant was in custody at this time.

"It is a basic principle of the Fourth Amendment that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). However, the law does permit some exceptions to the warrant requirement under the Fourth Amendment. *Id.* To conduct a valid search of Defendant's residence without a warrant, the Government must demonstrate that some exception of the warrant requirement is applicable. A recognized exception to the warrant requirement arises when an individual either actually or apparently consents to a search. *United States v. Grove*, 470 F.3d 311, 318 (7th Cir. 2006) (quoting *Georgia v. Randolph*, 547 U.S. 103 (2006)).

In determining if a consent to search was voluntary, the consent is to be considered within the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Factors considered in determining whether a consent was voluntary include:

> (1) the person's age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent.

*United States v. Sandoval-Vasquez*, 435 F.3d 739, 744 (7th Cir. 2006). The first factor was not clearly addressed in Defendant's motion or briefs nor at the suppression hearing. Moreover, while Defendant had not yet been given his *Miranda* warnings at the time he consented to the search, the agents were not required to *Mirandize* him prior to obtaining his consent. The Seventh Circuit has "held that a consent to search is not an interrogation within the meaning of *Miranda*." *United States v. Shlater*, 85 F.3d 1251, 1256 (7th Cir. 1996) (citing *United States v. Saadeh*, 61 F.3d 510, 515 (7th Cir. 1995)).

Furthermore, the other factors indicate that Defendant's consent to the search was voluntary. The agents' testimony was credible and unrebutted. Defendant was detained only momentarily to be checked for weapons prior to being asked, in Spanish, if the agents could search his home. He gave his consent immediately, was cooperative, and did not appear agitated. Defendant told the agents where the keys to his residence were located and, after agreeing to the search, accompanied the agents to his place of employment so they could obtain his keys. When the agents returned to Defendant's residence, Defendant directed them to the specific entrance they would need to use, and

Defendant actually unlocked the door to the residence for the agents. No evidence was presented that Defendant declined to have his residence searched or attempted to withdraw his consent at any time prior to the search. Moreover, after verbally consenting to the search and allowing the agents into his residence, Defendant signed a form, indicating, in Spanish, that he had "not been threatened or forced in any way." (Hr'g Tr. 65:19 – 66:5.) The form further provided that "I have given my consent freely to this search." (*Id.*) As set out above, this form was read aloud to Defendant in Spanish, and he appeared to read it again to himself before signing it. Based on the totality of the circumstances, Defendant's consent to the search was given voluntarily.[3] Therefore, the warrantless search of Defendant's residence was legal.

## *Miranda* Warnings

Finally, Defendant argues that he was not properly apprised of his *Miranda* rights and that, therefore, any statements made to the agents should be suppressed. Defendant asserts that the statements he gave to the agents were given without his being aware of his *Miranda* rights. (Mot. to Suppress at 4.)

However, no evidence presented at the hearing supports this contention. As discussed above, when the illegal contraband was discovered in Defendant's residence, Avalos immediately thereafter read Defendant his *Miranda* rights in Spanish. Thereafter, Defendant was read a form, in Spanish, stating his *Miranda* rights, and Defendant

---

[3] Both sides concede Defendant may have been in custody at the time he and the agents drove to the grocery store where he was employed, but Defendant presented no facts that show his consent was the product of or caused by the subsequent arrest. Nor has any legal authority been submitted to support the proposition that a voluntary consent to a search given prior to being placed in custody is somehow vitiated after a defendant is placed in custody, nor has the Court found any such authority.

appeared to read this form before then signing it, in addition to initialing next to each individual *Miranda* right. These facts were supported by the testimony of the agents, which was also credible in this regard, and was not rebutted by any evidence submitted by Defendant. *See United States v. Hubbard,* 61 F.3d 1261, 1278 (7th Cir. 1995) (deferring to the determination of a district court judge "unless the district judge has chosen to credit *exceedingly* improbable testimony.") (emphasis in original). There was no evidence presented which indicated that Defendant did not freely waive his *Miranda* rights, after receiving them orally and in writing in his native language. Therefore, Defendant's Motion to Suppress the statements he made to the agents is denied.

## CONCLUSION

Based on the evidence submitted at the suppression hearing and the arguments presented by the parties, Defendant's Motion to Suppress Evidence is denied.

Date: 10-11-12

JOHN W. DARRAH
United States District Court Judge